Case No. 243831, Appalachian Voices, et al. v. United States Army Corps of Engineers, et al. Oral argument not to exceed 15 minutes per side, with 15 minutes to be shared by the respondents and intervener. Mr. Tini, you may proceed for the petitioners. Good morning again, Judge Moore. May it please the Court, I'd like to reserve five minutes for rebuttal here. Once more, I'm Derek Tini, along with Jamie Whitlock. We represent the petitioners in this matter. Another Federal Clean Water Act permit for the Cumberland Pipeline, but this one was issued by the US Army Corps of Engineers. And as in the companion case, the Army Corps here failed at every important step to engage in the requisite site-specific review of the pipeline stream crossings. But the Court also misunderstood the other applicable Clean Water Act approvals and entirely neglected the cumulative impact of multiple crossings on the same stream. Accordingly, petitioners respectfully request that this Court vacate the 404 permit. The least environmentally damaging practicable alternative, or LEDPA, analysis presents itself a little bit differently. Can I ask you one kind of overarching question? Certainly. They're replacing a coal plant, right?  And so they say, the Army Corps, I think it was the Army Corps, I can't remember exactly, that permanent impacts are limited to .03 acres of wetlands and everything else will be temporary. Yes, that's what they say. Okay. And it seems to me that if that's the case, won't the overall environmental benefit of this versus the coal-fired be better? Overall, where there's just temporary displacement in some areas and .03 acres or whatever they called it, 1,207 square feet or something, is the overarching? Sure. That question, to be honest, Your Honor, that's above my pay grade. But what is going on here is that the Clean Water Act is... Just so I'm clear.  In the overall review, we don't consider the ultimate impact that they decide? I know you do it issue by issue and place by place, and your briefing is excellent on this, but I want to understand just this overall issue and how it factors in, if at all. So the way that it factors in, if at all, is that the LEDPA has to serve the overall project purpose, right? The overall project purpose is to build this pipeline to connect a planned gas plant to an existing natural gas pipeline. Okay. That's as far as that goes in the LEDPA analysis, so long as all of the alternatives that are considered will achieve that purpose. So then the question becomes a little more myopic. And the fact of the matter is the Corps loves to be myopic, right? They don't want to consider the larger policy questions that you just asked me. They want to look at that stream and what happens beyond its banks. That's somebody else's problem. That's been their position for, well, since probably 1972 when the Act was enacted. But what they have to look at is what's going to happen to special aquatic sites, like riffle and pool complexes? And they assumed that each of these sites will be a riffle and pool complex, and we think that's correct because of the geography. And the 404B1 guidelines themselves say that the degradation that can occur from discharges into riffle and pool complexes is among the most severe that is regulated. And so when they say that it's temporary, what they mean is that it doesn't last forever in time immemorial. But it is not temporary by what's defined in the EIS, which is what the Corps supposedly relied on. The EIS defines temporary as things that will go away immediately after construction. And the Corps itself admits that here, these riffle and pool complexes, after they are destroyed and the pipeline is placed in there and the bed is reconstructed, it will take at least one or a few high-flow events to flush the sediment out to bring new cobble to those riffles. And that will only occur every 18 months. And so if it takes multiple events like that, we're looking at years of impacts to the riffle and pools, not just temporary. Is that permanent? It is not permanent in the sense that it exists forever, no. But it is also not temporary. They ignore it or they dismiss it or denigrate it as temporary. But it is not temporary. It will last for years and will have demonstrable effect on aquatic life during that time. So that's why the presumption exists. We presume that if you're messing around in a riffle and pool, that there are better ways to do it until you prove, until you prove that those other methods are impracticable. And so they have to prove that it's impracticable to go under these streams. And they have to do it again on a case-by-case basis. What do you mean they have to prove? What's the regulatory language that says they have to prove something? And who's to determine if they've proved it? Who's the adjudicator for this proof you're talking about? Certainly. The requirement comes from 40 CFR Section 230.10a.3. And that's the 404b.1 guidelines prescribed by EPA that govern this. And it has the presumption. And that presumption says that it must be demonstrated by clear evidence. And so courts have interpreted that language to place the burden on the applicant to provide clear and convincing information to the court, establishing that no other method, that the presumption is rebutted, that other methods are impracticable. And that same case law also tells us, in answer to your question, Judge Clay, of who's the adjudicator, that the court must independently verify that information. And that comes from the Utahns v. Better Transportation case, the Tenth Circuit case we cite. Okay. But if we look at the record here and determine, in our considered judgment, that the Army Corps of Engineers has taken into consideration the costs and technology and the logistics in light of the overall project purpose and has arrived at a reasonable determination, then what are we left with from the arguments you're advancing? Is it simply that the Army Corps of Engineers reached the wrong conclusion? And if so, how do we go about evaluating your recommended— I hate to keep calling it a conclusion—your conclusion that they've come out on the wrong side of the ledger. I mean, to say that they've got to reach a reasonable determination is one thing, and they can't be arbitrary and all that. But if the record seems to support that they evaluated alternatives reasonably and the disposition is not adverse to the regulatory requirements, then where does that leave us with your argument? My argument is that the record doesn't support the conclusion, that it was unreasonable. And I've got a case law I'll point out to you. We're not asking this court to determine which stream crossing method should be used. That remains a job to be determined by TGP with the Army Corps of Engineers, but based on the correct information and taking cost for an example. This is like the Utahns for Better Transportation case out of the Tenth Circuit. There, the applicant told the Corps, the alternative that's been proposed is too expensive. It's not practical for that reason. And the Corps simply accepted that without verifying it or looking behind it. And that's what we have here. We have TGP telling the Corps it might cost five times as much to do a conventional bore or HDD, without any kind of differentiation between the two. And the Corps doesn't take any steps to look behind that. And we point out to the Corps, Your Honors. I'm sorry. Can I interrupt you just a second?  Certainly, Judge Lafarge. It's my understanding, and you tell me if I'm wrong, that the TGP presents clear and convincing evidence. And the Corps determines it. And then our review is, is that determination arbitrary and capricious? And what you're arguing is, by providing no explanation, it's arbitrary and capricious. Certainly. Go ahead. Yes, that's correct. And that's the careful and searching inquiry that's required, of course, under the Administrative Procedure Act to make sure that there's a reasoned decision. There's no reasoned decision here to assume that the costs are impracticable. So the Corps has to do its own separate stream-by-stream analysis? It has to independently verify what's been provided on a stream-by-stream basis. That's correct. I'm not saying that they need to retain an engineer to go out and do cost estimates. But on this record, what we have is TGP saying it'll cost five times as much. Look at this spreadsheet from 2013. When the Army Corps has said, and this is in the record as well as one of our exhibits, the Army Corps has said that these cost discussions have to be done based on current information. And the cost estimates that they're providing are ten years old. They're inconsistent with what's happening throughout the industry with the increased use of conventional boring, which suggests that maybe it's not impracticable. And based on that record, more was needed from the Corps to explain why any particular crossing was too expensive to do using conventional boring. Because instead they just generalized without looking. There's no estimate of the cost of conventional boring at any particular stream. They've listed their challenges in the record. Why can't the Army Corps accept that? Because the other duty of an agency to explain its decision is to grapple with contrary record evidence. And their factors are contradicted by the record. And the Corps doesn't even acknowledge that FERC has said that conventional boring has been used for decades. That it's been used in geology where the boulders and the rock that we heard discussed is about one-third the size of the bore. These things can handle rocky geology. They can be done on streams that are of the width that are in this area. And the topography is also contradicted by the record. So that's what they needed to engage in. So if we were to assume that the 401 permit was properly granted, do you have a distinct problem with the Corps here? Yes, we do. Because the Corps standard is ostensibly higher. The burden for the Corps, because this involves special aquatic sites under the rebuttable presumption, is that the applicants got to present that clear and convincing information. And I see that I'm out of time if I may finish the question. And the other thing that's important here, we had a number of claims. We've only been able to talk about the independent review. But the cumulative effects analysis. That is a separate requirement of the 404b1 guidelines that falls on the Corps to look at cumulative effects of multiple discharge events. And they simply avoid, they ignore the record evidence on that. So that's a question that is different from what's going on in the 401 decision. Thank you. Thank you. May it please the Court. Rebecca Jaffe, appearing on behalf of the United States. With me at council table is Catherine Morris from the United States Army Corps of Engineers. The Corps engaged in extensive analysis and acted reasonably in issuing the permit. It analyzed alternatives, required TGP to minimize impacts in various ways, and determined that the impacts from constructing the pipeline would be minor and virtually all of them temporary. I'm going to start with the LEDPA, Least Environmentally Damaging Practical Alternative, then turn to minimization, and then if there's time, address the 401 certification and the water quality analysis. The Corps reasonably determined that there are no practicable alternatives to the proposed pipeline and no practicable alternatives that do not involve special aquatic sites. An alternative is practicable only if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. And that regulation is at 40 CFR 230.10A2. But does the Corps have to do this site by site? The Corps has to look at every crossing, and it absolutely did that here. It doesn't have to make the table that petitioners like. There's no regulatory or statutory requirement that says the end result must be just like the Table 15 in Mountain Valley Pipeline. So where would I go to find, to verify what you said, that the Corps did look at every crossing? Yes, Your Honor. So Appendix 286-89 is a table of every crossing from the Corps' memorandum for record. There are more sites, but I want to pause there and flag something very important. That table shows that there are 103 crossings for the pipeline itself. The other crossings are to get access to build the pipeline. Of those 103 crossings, 56 of the streams being crossed are under 5 feet wide, and 52 of them are ephemeral, so they will be dry when they're crossed. So there's other information tables of water body crossings, but that is really key because then the Corps looked at drilling methods, and it reasonably determined that building the pipeline by drilling was not practicable. For horizontal directional drilling, you need a 1,300-foot tunnel, even if you're going underneath a 4-foot dry stream. Horizontal directional drilling workspaces are 150 by 250 feet on each side of the stream. That isn't true for microtunneling? I'm not sure the specifics about microtunneling specifically. My understanding, Your Honor, is that all of the drilling techniques require staging areas, and they require sufficient depth. In horizontal directional drilling, it can be a flat staging area because you drill kind of on a radius, which is why the tunnel has to be 1,300 feet long so that your pipe radius isn't so steep that it breaks the pipeline. For conventional boring, you dig down in pits that are 50 feet wide by 150 feet long. The depth depends on the depth of the stream and the bedrock and everything, but you have to do that on both sides. Even if it's a 5-foot stream, so that you can go underneath. I guess, you know, obviously this is a scientific kind of question. I've seen a picture in one of the briefs here of something that looks like it's totally dry, but it's a stream bed and counts as one of these waterways, I gather. I don't understand why you have to go 1,200 feet in order to get something done underneath instead of digging from the top. Logically, is there somewhere that explains that, why you have to have this 1,300-foot tunnel? Yes, Your Honor. I would direct the court to Appendix 234. That's the Corps' memorandum for record, and that's where the Corps says that you need the radius to be, for lack of a better word, sufficiently gentle so that the pipe isn't so angled that it breaks. Yeah, I see that. Thank you. There's also evidence in the record that says drilling takes 10 to 30 days for each crossing. Trenching takes one to two days. There's evidence in the record about how much more expensive different drilling methods were than trenching. I would direct the court to Appendix 842, which is a table of how much more expensive it is by foot, in addition to the Corps' memorandum for record at Appendix 234. What about this argument that it's going to take several years to get the riffles back if you use open-cut trenching? Your Honor, the CGP, when they trench through a stream, so say it takes a day to build the trench, put the pipeline down, kind of support it with the right sort of clay on each side, they have to restore that streambed immediately. They have to restore the contours exactly as it was. Are you saying then that the riffles will reappear instantly? I'm saying, Your Honor, that the streambed contours and the gradient of the stream needs to be back instantly. That reference in the record is to the streambed substrate. Some streams, if they're really steep, they might just have pebbles, and it'll wash down the silt and the finer material further downstream. If it's really flat and kind of meandering, there'll be more silt. The Corps was saying for dry streams, you don't have water flowing that will flush the silt down or drop pebbles if there's no water. In the TDEC case, I heard you say wet weather conveyances. You need the wet weather flooding to move the pebbles around, and if it's steep, they'll drop pebbles. If it's meandering, it'll drop silt. So the streambeds and the stream contours will be restored immediately, and there are requirements in the record for TDEC to restore things, to compare to pictures from before they dug through. So if it was a steep stream, it has to be a steep stream again. But then the pebbles and things like that, if it's a dry stream, will take a flooding event to get flushed through. If the Corps has no further questions about the least environmentally damaging practicable alternative, I'm going to turn to the next issue, which is minimization. This is a separate component under the 404b1 guidelines. After identifying the LEDPA, the Corps needs to require TGP to minimize the impacts of construction, and the Corps did this in a variety of ways. It required TGP to trench in dry conditions, which will reduce sedimentation. Instead of water flowing through the site as TGP is digging the trench, and the water's picking up mud and dirt and flushing it downstream, instead of that, TGP needs to build a dam. If the stream is flowing, a lot of them will be dry. But TGP needs to build a dam and route the flow around the worksite so that it will be working in the dry. In addition, when it's digging trenches, it must use the machine that causes the least impact. The requirement to use the least impactful trenching method is not a piece of the alternatives analysis. It's a minimization requirement. The alternatives analysis is about alternatives to the proposed discharge, and the discharge is building the dam to route the water around and then backfilling the trench so that the stream is exactly how it was before. That's what the discharge is. And the alternatives analysis is about what are the alternatives to the discharge. Can we build the pipeline somewhere else? But once you say, here's where we're going to build it, the alternatives here for trenching all have the exact same discharge. But the core said TGP has to minimize the impacts by using the least impactful trenching method. And the regulations, for example, 40 CFR 230.74a, say that minimization involves things like using appropriate equipment or machinery. And that is what the core did here. Turning to the next issue, the core... Again, that has to be done on a stream-by-stream basis. The guidelines do not mandate that minimization analysis must be done on a stream-by-stream basis. The core mandated that TGP must use the least impactful trenching method at each stream. So TGP does have some flexibility to say, okay, we can't get a conventional excavator up here, but we already have our ripper machine up here because we used it 100 yards over, so we'll use that one, and we need that because the bedrock that we're encountering is much harder. That's minimization, and minimization can be done during construction. But the core has to require them to minimize impacts, and that's what the core did here by requiring dry construction and by requiring the least impactful trenching method. Also, it's very important to note here that a key piece of minimization is the core prohibited blasting in waters of the United States or in areas with karst-prone geology. If TGP wants to blast, it needs to come back to the core, submit written justification, and get the core's concurrence in writing. Do we know how many of these streams are considered waters of the United States? So the core did a preliminary jurisdictional determination, which is where it determines whether the presence of waters of the United States is likely and provides approximate boundaries. It has not done the final determination, which is called an approved jurisdictional determination for these waters. It does expect that not all of the 146 crossings are waters of the United States, but some of them certainly are. And my understanding is that TGP doing an approved jurisdictional determination takes more time. It often requires the core to go out in person, and my understanding is that TGP wanted the core to move forward. So it is likely that of these 146 crossings, some of them are not waters of the United States, but the core hasn't made that final determination, and some of them certainly are. When TGP picks the method, is there any core oversight? Do you all check that the method they picked was the best method? So first of all, the permit requires TGP to use the least impactful method. But who checks? The core has a right to inspect. It inspects about 10 percent of projects every year. It can go out, and that's as part of accepting the permit. TGP has accepted that the core can come out and do inspections, and for high-visibility projects, the core is more likely to go out and do inspections. And is this a high-visibility one? I would say so, Your Honor. We're here, but no. Yes, Your Honor. I see that my time is up. If the Court has no further questions, it should deny the petition and uphold the permit. Thank you. Thank you. May it please the Court, in my limited time here, I think it's important to step back and think about all of Sierra Club's criticisms of the 404 permit in the proper context. In issuing this permit, the core found that the impacts of the construction activities being permitted within the core's jurisdiction were very minimal. There will be zero loss of wetlands, zero loss of streams. There will be no permanent impact to Tennessee waters. The impacts are all temporary. We're talking about temporary impacts to two-thirds of a single acre of wetlands and 2.39 acres of streams. And again, all of those impacts will be restored. The wetlands and the streams will be restored. I thought there were some permanent, but it was not. Getting to that right now. There are permanent impacts, and we're looking at a conversion of 1,300 square feet of land, not a whole lot bigger than this courtroom, from forest to another type of vegetation, herbaceous. And that needed to be done to clear the right-of-way where it crosses streams. 1,300 square feet, that is it. And all of those minimal impacts are being fully mitigated because TGP was required to purchase mitigation credits from Tennessee. Their belief is that some of these open, dry-cut trenches are going to have some significant effects at least for a while. And that the riffles and so forth are going to take 18 months or three years or so forth to get back. And meanwhile, various marine life will be impacted. So how do you respond to that? I understand that allegation, Your Honor. That is simply Sierra Club disagreeing with the expert conclusion of the agency that studied the methodologies by which these crossings would be done. Using the dry method prevents sedimentation. There's also many conditions that were imposed upon Tennessee Gas by the Corps to help prevent sedimentation. And the Corps, in its expertise, has come up with a different estimate for when various aquatic resources will be restored to their full normal capacity. Sierra Club simply disagrees with that conclusion. Wouldn't boring avoid sedimentation issues completely? Yes, it would. That's the advantage of boring. The problem with boring and the analysis that the Corps has to do, it has to look at the entire range of factors and what impacts would boring have on other environmental resources. They look at the cost, they look at the feasibility, all the things we've been talking about. And that's a calculus that the Corps is expert at performing. And it has decided that boring is not a practicable alternative to the dry-crossing method that the Corps has found, and its expert judgment will not result in sedimentation of downstream waters. And I see my time is up. Can you just briefly explain why 1,300 feet are needed to do a boring? I know that we've been pointed to this particular statement at App 234, which says that each HDD crossing would require borings of a minimum of 1,300 linear feet. Does that apply to all the different kinds of borings? It does not. It does not. The 1,300 linear feet for HDD is, as Ms. Jaffe said, it has to maintain a lack of a radius, otherwise the pipe would break. The conventional boring is done differently, but there you have to dig a 100-foot pit on one side of the crossing and a 150-foot pit on the other side of the crossing, so that creates other environmental disturbances. And that's the kind of thing that the Corps weighs in its calculus, does this balancing of whether this alternative method is a practicable method, and it concluded that it was not. And then there are three other kinds of borings, but nobody seems to think those are worth talking about. Well, they are related to conventional boring. They're a little more high-tech, but they do involve the same practicable problems as conventional boring. Exactly. And the same difficulties getting through rock, the same difficulties with streams with sharp slopes, getting access to that crossing. Thank you. Thank you. A few points on rebuttal. Beginning with this question of 1,300 feet, we agree with Mr. Super that not every crossing method requires 1,300 feet of space. And we, Sierra Club, the petitioners, do think that the other methods are worth talking about, direct pipe, microtunneling. Those are examples that have been used on pipelines. The Mountain Valley Pipeline, in fact, used them to cross some of the larger streams in their course. But the thing to remember about the digging of the pits and how that might be impracticable is you have to remember that TGP has a 32-mile-long workspace that's at least 125 feet wide, and it's digging in the ground to bury a pipe already. So digging those bore pits, they're already digging into the ground there. So digging a little deeper to allow themselves to jack the pipe under the stream, the consideration has no aquatic resources. As you observed, Judge Moore, it prevents the sedimentation. And so the core, yes, other disruptive consequences are part of the calculus, but the main focus is on the presumption is that you should protect those riffle and pool complexes. On the question of Table 15 and what the core requires, I would direct the court to App 684, and this is instructions from one of the core districts to how to go through a LEDPA analysis, and that page shows that the core prefers a matrix to work through the LEDPA just like what you see at Table 15. So yes, it may not be a requirement, but that's what they prefer, to see this kind of review of each crossing and explanation. On the question of the length of time for recovery, it's not just Sierra Club's disagreement of opinion. We agree with the core that it will take high-flow events to flush these streams, and that can take years. That's supported by the scientific literature that's in the appendix. The Armitagian-Gunn study showed that the sedimentation effects can last for four years. Levaskin-Dubé saw that as well. And again, it's because when is that flush going to come through to flush the sediment out? And the sediment just isn't at the workspace. It's adjacent to the stream because the sediment flows downstream and clogs the area downstream that wasn't necessarily trenched through, but now it may be embedded with sediment, and it takes a high flow to flush that out. And respectfully to the core, they did not limit that to the ephemeral streams. It's not just ephemeral streams that have to wait for water to flush the sediment out. It is perennial and intermittent streams as well. There was no limitation on the core's conclusion that it would take those high-flow events, that it was only limited to ephemeral streams. Staying with this question of the duration of impacts, take, for example, Lickskillet Branch. Lickskillet Branch will be cut three times by this pipeline. And the petitioners pointed the core to scientific record evidence that says that cutting a stream multiple times to bury this pipeline can stress the resiliency of the stream and its ability to recover to the point where it may have permanent detrimental effects. These are the permanent effects that could occur. And that's why we requested, and the law requires them to consider, the cumulative impacts of these multiple crossings. The record is silent on those, and that is a failure of analysis because they failed to grapple with contrary record evidence. And under the D.C. Circuit's Fred Meyer opinion that we have cited in our brief, more is required to deal with this kind of scientific literature that calls into question the core's conclusions. So suppose that we were to say, oh, yeah, you're right, but simply on this cumulative impact point. What would the remedy be? Would we stop the entire pipeline? I think that you would have to because what you may end up with is... For example, if you look at... There could be real-world applications. This isn't a question of rewriting the explanation. Because in examining the crossings on, take, for example, Lickskillet Branch, the conclusion may be, hey, those are too close together to cross them three times in a row. We should go under at one or more of those crossings, and that would be a substantive change. And so to preserve the status quo and to avoid disrupting the environment, which is what the point of the Clean Water Act is, there should be a vacature of the... Of the entire project? Of the entire project, yes. Not just hypothetically because there's one problem, because there are three cuts to this particular stream? I use Lickskillet as an example. There are other streams that are crossed multiple times.  if we just find a limited number of issues... I know that there was the argument that we should not vacate the entire project, but rather issue a more targeted remand, and I'm trying to get your answer. You're seemingly saying we cannot have a more targeted answer. I see that I'm out of time. May I respond to your question? Thank you. I don't think that a more targeted decision or ruling is appropriate here, because what it could lead to is if... For example, if you determine that Lickskillet Branch shouldn't be crossed three times using open-cut crossings, it may be that TGP determines, well, to avoid the cost of doing those open cuts, we actually would prefer to avoid Lickskillet Branch and move the pipeline. And so there may be reasons to adjust the course that we just simply can't predict in this courtroom here today. There may be, I guess what I'm saying, route changes that may trickle down from crossing method changes. And under the APA, I would respectfully request the required... that the decision is required to be set aside. They decided to do this as a single individual permit. It should rise or fall as a whole. Thank you. With that, we ask that you vacate the 404 permit. Thank you, Your Honors. Thank you all for your argument, and this case will be submitted.